F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 2 6 2022   ★

BROOKLYN OFFICE

AAS:JAM/JEA
F. #2021R00963

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

ANDRII DERKACH,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

I N D I C T M E N T

Cr. No. CR 22 - 432

(T. 18, U.S.C., §§ 981(a)(1)(C),
982(a)(1), 982(a)(2), 982(b)(1), 1349,
1956(h), 1957(a), 1957(b), 1957(d)(1),
2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c); T.
50, U.S.C., §§ 1705(a) and 1705(c))

IRIZARRY, J.
KUO, M.J.

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.      The Defendant

1.      The defendant ANDRII DERKACH was a Ukrainian national.   After

studying at Kharkiv Higher Military Command, DERKACH served as a combat crew

commander in the Soviet Union's Strategic Missile Forces.   From 1990 to 1993, he attended

and graduated from the Moscow-based Academy of Ministry of Security of Russia, also

known as the Academy of the Federal Security Service ("FSB") of the Russian Federation.

DERKACH thereafter assumed multiple roles in the Ukrainian government.   In 2022,

DERKACH was approximately 54 years old.

2.      Since 1998, except for a hiatus from November 2006 to November

2007, the defendant ANDRII DERKACH was a member of the Verkhovna Rada ("Rada"),

Ukraine's Parliament.   During his time in the Rada, DERKACH was a member of the Party

of Regions, a pro-Russia political party, which was the ruling party in Ukraine from 2010 until the 2014 Ukrainian Euromaidan Revolution. More recently, DERKACH represented the Sumy region in northeastern Ukraine and claimed to be an independent with no political party affiliation.

3. On or about September 10, 2020, the U.S. Department of the Treasury's Office of Foreign Asset Control ("OFAC") added the defendant ANDRII DERKACH to its List of Specially Designated Nationals and Blocked Persons ("SDN List") for his efforts to influence the 2020 U.S. presidential election. According to information publicly released by OFAC, DERKACH was "an active Russian agent for over a decade, maintaining close connections with the Russian Intelligence Services" who "waged a covert influence campaign" to undermine the 2020 U.S. presidential election.

4. On or about January 11, 2021, OFAC added the entities NabuLeaks and Era-Media TOV ("Era-Media") to the SDN List for being part of "a Russia-linked foreign influence network associated with [the defendant ANDRII DERKACH]." NabuLeaks was established in or about 2019, and Era-Media was established in or about 2010. According to information publicly released by OFAC, DERKACH "has been the de facto owner of Era-Media-related companies since the 1990s. More recently, [DERKACH] created the NabuLeaks platform to disparage the National Anti-Corruption Bureau of Ukraine ('NABU')."

5. The defendant ANDRII DERKACH endeavored to sow discord in the U.S. political system and interfere in the 2020 U.S. presidential election through multiple acts in the time preceding his designation as a Specially Designated National. For example, using his political influence and position in the Rada, DERKACH and his co-conspirators

made various expenditures in furtherance of their efforts to disrupt the election, including payments for consulting services, visas and travel to the U.S. and elsewhere, and hosting services for internet websites.   NabuLeaks was one of these websites, which published purportedly sensitive information regarding NABU.   Much of the information on NabuLeaks was supplied by DERKACH and his co-conspirators and was designed to influence the 2020 U.S. presidential election.

6.    According to Ukrainian public databases and records, the defendant ANDRII DERKACH was the "founder" and "beneficiary" of Era-Media.   On DERKACH's own website, derkach.com.ua, DERKACH was identified as "Honorary President of the media holding company Era-Media."   In some public Ukrainian records, the defendant's wife ("Co-Conspirator-1") was listed as a "beneficial owner" or "founder" of Era-Media. After OFAC added Era-Media to the SDN List, Co-Conspirator-1 was removed as a "beneficial owner" and "founder" from these records.

II.    The International Emergency Economic Powers Act
    and the Relevant Sanctions Orders and Regulations

7.    The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, conferred upon the President the authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.   Section 1705 provided, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."   50 U.S.C. § 1705(a).

8.      Using the powers conferred by, among other things, IEEPA and the

National Emergencies Act, Title 50 United States Code, Sections 1601 et seq., the President

issued Executive Order ("E.O.") 13848 on September 12, 2018, declaring a national

emergency based on a finding that "[t]he ability of persons located, in whole or in substantial

part, outside the United States to interfere in or undermine public confidence in United States

elections, including through the unauthorized accessing of election and campaign

infrastructure or the covert distribution of propaganda and disinformation, constitutes an

unusual and extraordinary threat to the national security and foreign policy of the United

States."   The President renewed E.O. 13848 multiple times, most recently on September 7,

2021.

9.      Pursuant to E.O. 13848 Section 2(a), the Secretary of Treasury could

sanction any foreign person who, among other things, directly or indirectly engaged in,

sponsored, concealed or otherwise had been complicit in foreign interference in a United

States election or who had materially assisted, sponsored or provided financial, material or

technological support for such activity.   These sanctions included blocking all property and

interests in property in the United States or that thereafter came within the United States.

Individuals and entities sanctioned pursuant to E.O. 13848 were added to OFAC's SDN List.

10.     To implement E.O. 13848, OFAC issued the Foreign Interference in

U.S. Elections Sanctions Regulations, 31 C.F.R. Part 579, on April 29, 2019.

11.     According to E.O. 13848 and the Foreign Interference in U.S. Elections

Sanctions Regulations, a person whose property and interests in property was blocked was

treated as having an interest in all property and interests in property of any entity in which

the person owns, directly or indirectly, a 50 percent or greater interest.   See 31 C. F. R.

§ 589.406.   Accordingly, the property and interests in property of that entity were blocked, regardless of whether the name of the entity was included on OFAC's SDN List.   Id. Additionally, any U.S. person or entity holding funds subject to the Foreign Interference in U.S. Elections Sanctions Regulations was required to hold or place such funds in a blocked interest-bearing account located in the United States, as "[f]unds subject to this section may not be held, invested, or reinvested in a manner that provides financial or economic benefit or access to any [SDN] whose property and interests in property are blocked."   See 31 C.F.R. § 579.203.   With respect to tangible property that was blocked, Executive Order 13848 and its implementing regulations prohibited paying for "expenses incident to the maintenance" of such property from blocked funds.   See 31 C.F.R. § 579.204.   An individual or entity could obtain a license from OFAC to transact with an individual or entity on the SDN List.   However, the failure to obtain a license prior to transacting with an SDN constituted a violation of IEEPA.   See 50 U.S.C. § 1705(a).

III.   The Bank Secrecy Act

12.   The U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") was responsible for administering the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., in furtherance of its mission to safeguard the U.S. financial system.   Under the Bank Secrecy Act, financial institutions were required to assist U.S. government agencies in detecting and preventing money laundering, including reporting suspicious activity that might signal criminal activity.   Additionally, an amendment to the Bank Secrecy Act incorporated provisions of the USA Patriot Act, which required every bank to adopt a customer identification program, commonly referred to as "Know Your Customer," as part of its Bank Secrecy Act compliance program.   See 12 C.F.R. §§ 21.11 and 21.21.

IV.    The Bank Fraud Scheme and the Purchase of the Subject Condominiums

13.    Beginning in at least 2013, the defendant ANDRII DERKACH and Co-Consiprator-1 devised a scheme to purchase two condominiums located at 432 North Oakhurst Drive, Units 103 and 203 in Beverly Hills, California (the "Subject Condominiums") while concealing DERKACH's interest in the transactions from U.S. financial institutions.   The scheme utilized a U.S.-based financial services professional (the "Nominee"), an individual whose identity is known to the Grand Jury.   The Nominee assisted DERKACH and Co-Conspirator-1 in setting up and managing several corporate entities designed to hide DERKACH's ownership interest in the Subject Condominiums and related financial holdings.   The Nominee understood that DERKACH and Co-Conspirator-1 would occupy one of the Subject Condominiums, and the other would be used by their children.

14.    Moreover, in the years and months preceding his designation, the defendant ANDRII DERKACH spent significant time in the United States, including at the Subject Condominiums.   In conducting that travel to, and spending time in, the United States, DERKACH was actively involved in deceiving U.S. law enforcement and border authorities even prior to his SDN designation.   For example, in December 2019 and February 2020, DERKACH was in the United States to meet with U.S. persons and conduct media appearances.   To obtain a U.S. visa, and to ostensibly attend meetings and conferences related to human rights issues in Ukraine, DERKACH retained the services of a U.S. based consulting firm ("Firm-1"), an entity the identity of which is known to the Grand Jury.   The written contract purported to be between Firm-1 and a Ukrainian shipping

company and did not refer to DERKACH, notwithstanding DERKACH's direct involvement in the provision of services that the contract purported to reflect.

15.     In or about and between July 2018 and December 2018, the defendant ANDRII DERKACH paid Firm-1 approximately $100,000 through a bank account of Firm-1.   One such payment occurred on August 29, 2018, when $25,000 from an account held in the name of the Ukrainian shipping company was sent to Firm-1 via wire transfer through the Eastern District of New York.   In a July 11, 2018 email communication with Firm-1, DERKACH's representative expressed concern that, "given the fact that my client [DERKACH] is a politically exposed person, as well as the statements he made concerning Ukraine's interference into US elections and the insider information we have in our possession," the visa application process could be potentially complicated for DERKACH.

16.     In or about and between 2013 and 2019, the defendant ANDRII DERKACH and Co-Conspirator-1 communicated with the Nominee through emails and during numerous in-person meetings in the United States to discuss the purchase and maintenance of the Subject Condominiums.

17.     At the direction of the defendant ANDRII DERKACH and Co-Consirator-1, the Nominee established two corporate entities in California: 73DT Business Properties, LLC ("73DT") and 7D Business Bureau, Inc. ("7D").   On corporate documents, 7D was the "Managing Member" of 73DT, while Co-Conspirator-1 was listed as the "President, Chief Executive Officer, Secretary and Chief Financial Officer" of 7D and the Nominee was listed as the "director."   DERKACH's name did not appear in the corporate documents for either 73DT or 7D.   Notably, "DT" were the letters correlating to initials of DERKACH and Co-Conspirator-1's last names, respectively.

18. As part of the scheme, the defendant ANDRII DERKACH and Co-Conspirator-1 misrepresented details about DERKACH's identity to the Nominee. DERKACH and Co-Conspirator-1 caused the Nominee to falsely represent ownership of funds and bank accounts to U.S. financial institutions, thereby deceiving those institutions into processing transactions related to, involving and on behalf of DERKACH and blocked property.

19. In or about July 2013, the defendant ANDRII DERKACH and Co-Conspirator-1 met with a wealth manager in Beverly Hills, an individual whose identity is known to the Grand Jury and who was affiliated with a multinational investment bank and financial services company ("Bank-1"), an entity the identity of which is known to the Grand Jury. The defendant and Co-Conspirator-1 sought to open a brokerage account at Bank-1, which account was to be in the name of 7D with Co-Conspirator-1 listed as the beneficial owner and the Nominee serving as account signatory, and without naming DERKACH on the account. Co-Conspirator-1 indicated that the initial deposit would be for $500,000, which Co-Conspirator-1 claimed was from the sale of stock in Era-Media. Co-Conspirator-1 also stated that the expected assets under management would be approximately $2.5 million and identified herself as a "supervisor" and 18% owner of Era-Media. While Co-Conspirator-1 claimed on Bank-1's account opening application ("Application-1") to have worked for Era-Media since 2001, she stated in her 2007 U.S. visa application that she was employed by a Ukrainian nuclear energy company where DERKACH was also employed at the time.

20. One of the questions on Application-1 asked if "any of the beneficial owners, authorized signatories, grantors/settlors/creators, trustees or individuals acting as

power of attorney" were "politically exposed persons."   Co-Conspirator-1 indicated on Application-1 that the defendant ANDRII DERKACH, her husband, was a politically exposed person who was currently serving in the Rada, but falsely indicated that DERKACH would not be a beneficiary of the account.

21.     After conducting its due diligence, including Know Your Customer research, Bank-1 refused to open the account on January 2, 2014, citing extensive negative press about the defendant ANDRII DERKACH.   When queried about this by the Nominee, DERKACH stated that the bank must have confused him with another person named "Andrii Derkach."   Notably, in a subsequent account opening application ("Application-2") with a different investment bank ("Bank-2"), an entity the identity of which is known to the Grand Jury, DERKACH and Co-Conspirator-1 did not mention Co-Conspirator-1's relationship to DERKACH.

22.     In or about 2013, the Nominee received approximately eight wire transfers totalling approximately $3.92 million from the defendant ANDRII DERKACH and Co-Conspirator-1 for the purpose of purchasing the Subject Condominiums.   These wire transfers originated from overseas accounts in the names of shell companies, Sakret Limited ("Sakret") and James Trade and Invest S.A. ("James Trade").   Sakret and James Trade were registered in the British Virgin Islands.   Neither Sakret nor James Trade had any public business profile, internet presence or discernible affiliation with either DERKACH or Co-Conspirator-1.   The Sakret and James Trade bank accounts were held at banks in Latvia and Switzerland, respectively.   Neither of the bank accounts were in the name of or had any identifiable affiliation with DERKACH or Co-Conspirator-1.   The Nominee received these

funds in a business account the Nominee named a "Client Specific Trust Account," which also had no identifiable connection to DERKACH or Co-Conspirator-1.

23.     At the direction of the defendant ANDRII DERKACH and Co-Conspirator-1, the Nominee transferred approximately $3.115 million of the $3.92 million from the "Client Specific Trust Account" to an account at a title insurance company to purchase the Subject Condominiums.   On or about December 6, 2013, Unit 103 was purchased for approximately $1.65 million, and Unit 203 was purchased for approximately $1.55 million.   Both purchases were paid in cash and executed in the name of 73DT by the Nominee, with neither DERKACH nor Co-Conspirator-1 having any visible affiliation with the purchases or ownership of the Subject Condominiums.

24.     The approximately $800,000 that remained from the original $3.92 million sent by the defendant ANDRII DERKACH and Co-Conspirator-1 for the purchases of the Subject Condominiums was transferred by the Nominee to a brokerage account ("Brokerage Account-1") at Bank-2, which was opened in December 2013.   Brokerage Account-1 was held in the name of 7D and the account opening documents were completed by the Nominee.   Notably, as part of opening Brokerage Account-1, the Nominee submitted a two-page document from the California Secretary of State listing Co-Conspirator-1 as the President, Director, Chief Executive Officer, Chief Financial Officer and Secretary of 7D. However, the application for Brokerage Account-1 omitted material information regarding DERKACH and Co-Conspirator-1, as the application did not acknowledge that DERKACH or Co-Conspirator-1 "is or has been a Politically Exposed Person, also known as a senior foreign political figure or [that you are or have] an immediate family member or close associate of a senior foreign political figure."   The application also misrepresented that 7D

was not "beneficially, or majority owned by the senior foreign political official."   The
account opening agreement from Brokerage Account-1 also required that "this account will
not be used for any transactions with, or for the benefit of, any person, entity or country that
is the subject of any sanctions administered or enforced by [OFAC], including . . . any person
on the [SDN List]."

25.   In or about and between September 2015 and October 2015, a series of
wire transfers were made from Brokerage Account-1 to a brokerage account ("Brokerage
Account-2") at another U.S. investment bank and financial services company ("Bank-3"), an
entity the identity of which is known to the Grand Jury.   Brokerage Account-2 was created
in or about August 2015 in the name of 7D, with the Nominee listed as the "Secretary,"
"President" and "sole officer."   The account application did not refer to either the defendant
ANDRII DERKACH or Co-Conspirator-1.   By the end of October 2015, the funds
previously held in Brokerage Account-1 were transferred to Brokerage Account-2, leaving
Brokerage Account-1 with a zero balance.

26.   In or about and between September 2015 and April 2022, periodic
transfers totalling approximately $625,000 from Brokerage Account-2 were made to a
business checking account ("Business Account-1") at a California-based bank ("Bank-4"), an
entity the identity of which is known to the Grand Jury, which was held in the name of 7D
and listed the Nominee as "Secretary."   Nowhere on the account application or opening
documents for Business Account-1 did the defendant ANDRII DERKACH or Co-
Conspirator-1 acknowledge any ownership interest or affiliation with the account or with 7D.

27.   At meetings between the Nominee and the defendant ANDRII
DERKACH and Co-Conspirator-1, DERKACH demonstrated a knowledge of and interest in

the assets under management by the Nominee, including by reviewing financial statements

involving the costs associated with the Subject Condominiums.   DERKACH also reviewed

statements from Brokerage Account-2 and opined to the Nominee that the underlying

portfolio in Brokerage Account-2 should be more profitable.

V.     Payments Related to the Subject Condominiums in Violation of IEEPA

28.     At all times relevant to this Indictment, and since the date of his OFAC

designation, the defendant ANDRII DERKACH has been aware of and actively working to

evade the OFAC sanctions placed upon him.   Indeed, on or about September 10, 2020, the

day that OFAC designated DERKACH, pursuant to E.O. 13848, and added him to its SDN

List for his efforts to influence the 2020 U.S. presidential election, DERKACH posted a

response on Facebook, stating the "decision was drawn up on a piece of paper by several

congressman of [a U.S. political party] and inspired by representatives of the State

Department."

29.     Moreover, the defendant ANDRII DERKACH has used Business

Account-1, since its inception, to make payments on his behalf and on behalf of Co-

Conspirator-1 to maintain the Subject Condominiums.   These payments included

homeowners' association dues, utilities, taxes and other fees.   In each instance, the Nominee

initiated the payment from Business Account-1 on behalf of DERKACH and Co-

Conspirator-1.   Funds originating from Brokerage Account-2 were also used to pay the

Nominee for the services he provided to DERKACH and Co-Conspirator-1 with respect to

the Subject Condominiums and financial holdings.

30.     The Nominee continued to make transactions from Brokerage Account-

2 and Business Account-1 after September 10, 2020, the day that OFAC designated the

defendant ANDRII DERKACH and added him to the SDN List.   Because DERKACH and

Co-Conspirator-1 obscured details about DERKACH's identity and involvement from the

financial institutions holding the aforementioned bank and brokerage accounts, DERKACH

and Co-Conspirator-1 prevented those financial institutions from moving funds held in the

name of 7D into blocked accounts, and instead caused those financial institutions to engage

in transactions involving blocked funds and transactions for the benefit of the Subject

Condominiums, which were blocked property pursuant to E.O. 13848 and the corresponding

sanctions regulations.

        31.     Several of these payments involving blocked funds were in amounts

greater than $10,000, including a $50,000 transfer from Brokerage Account-2 to Business

Account-1 on October 13, 2020; a $100,000 transfer from Brokerage Account-2 to Business

Account-1 on July 30, 2021; and a $30,000 transfer from Brokerage Account-2 to Business

Account-1 on April 28, 2022.   As of June 2022, the portfolio value of Brokerage Account-2

was over $400,000.

        32.     Additionally, since September 10, 2020, over $200,000 in payments

were made from Business Account-1 in relation to the Subject Condominiums, which were

blocked property pursuant to Executive Order 13848 and the corresponding sanctions

regulations.   These payments included property taxes, homeowners association fees, utilities

and other fees.

        33.     According to records relating to the Subject Condominiums, after

September 10, 2020, the list of authorized residents included the defendant ANDRII

DERKACH and Co-Conspirator-1's children, as well as DERKACH's mother and father, yet

omitted DERKACH and Co-Conspirator-1.   One of the children of DERKACH and Co-

Conspirator-1 resided in a Subject Condominium until September 10, 2020, the day

DERKACH was added to the SDN list; that child moved out of the residence on the same

day.

COUNT ONE
(Conspiracy to Violate IEEPA)

34. The allegations contained in paragraphs one through 33 are realleged

and incorporated as if fully set forth in this paragraph.

35. In or about and between September 2020 and August 2022, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant ANDRII DERKACH, together with others, did knowingly and willfully conspire

to violate the IEEPA, contrary to 50 U.S.C. § 1705, Executive Order 13848 and 31 C.F.R. §§

579.203-204.

36. It was a part and an object of the conspiracy that the defendant ANDRII

DERKACH, together with others, knowingly and willfully violated the IEEPA, and the

regulations promulgated thereunder, to wit: DERKACH and his co-conspirators knowingly

and willfully caused (a) U.S. persons and financial institutions to provide funds, goods and

services to and for the benefit of DERKACH, whom OFAC had listed as a Specially

Designated National, and to and for the benefit of property owned and controlled by

DERKACH, to wit: 432 North Oakhurst Drive, Units 103 and 203, Beverly Hills, California,

and (b) U.S. persons to receive funds, goods and services from DERKACH and from

companies owned and controlled by DERKACH and to transfer, pay, export, withdraw and

otherwise deal in interests in property in the United States held by DERKACH, without first

obtaining the required approval of OFAC, contrary to Executive Order 13848 and 31 C.F.R. §§ 579.203-204.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3551 et seq.)

## COUNT TWO
### (Bank Fraud Conspiracy)

37.     The allegations contained in paragraphs one through 33 are realleged and incorporated as if fully set forth in this paragraph.

38.     In or about and between January 2013 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANDRII DERKACH, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Bank-1, Bank-2, Bank-3 and Bank-4, contrary to Title 18, United States Code, Section 1344(1).

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
### (Money Laundering Conspiracy)

39.     The allegations contained in paragraphs one through 33 are realleged and incorporated as if fully set forth in this paragraph.

40.     In or about and between December 2013 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANDRII DERKACH, together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of one or more specified unlawful activities,

to wit: violations of the IEEPA, Title 50, United States Code, Sections 1705(a) and 1705(c),

(a) with the intent to promote the carrying on of specified unlawful activity, to wit: violations

of the IEEPA, Title 50, United States Code, Sections 1705(a) and 1705(c), contrary to Title

18, United States Code, Section 1956(a)(1)(A)(i); and (b) knowing that the property involved

in such financial transactions represented the proceeds of some form of unlawful activity,

and knowing that such transactions were designed in whole and in part to conceal and

disguise the nature, the location, the source, the ownership and the control of the proceeds of

said specified unlawful activity, contrary to Title 18, United States Code, Section

1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNTS FOUR THROUGH SEVEN
(Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

41.     The allegations contained in paragraphs one through 33 are realleged

and incorporated as if fully set forth in this paragraph.

42.     On or about and between September 10, 2020 and August 2022, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant ANDRII DERKACH, together with others, did knowingly and

intentionally engage in one or more monetary transactions in and affecting interstate

commerce in criminally derived property of a value greater than $10,000 in the approximate

amounts set forth below that was derived from specified unlawful activity, to wit: violations

of the IEEPA, Title 50, United States Code, Sections 1705(a) and 1705(c):

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission, including Approximate Amount |
|---|---|---|
| FOUR | October 13, 2020 | $50,000 wire transfer from Brokerage Account-2 at Bank-3 to Business Account-1 at Bank-4 through a server in the Eastern District of New York |
| FIVE | October 15, 2020 | $43,094.29 wire transfer from Business Account-1 at Bank-4 through a server in the Eastern District of New York, to pay property taxes for the Subject Condominiums |
| SIX | July 30, 2021 | $100,000 wire transfer from Brokerage Account-2 at Bank-3 to Business Account-1 at Bank-4 through a server in the Eastern District of New York |
| SEVEN | April 28, 2022 | $30,000 wire transfer from Brokerage Account-2 at Bank-3 to Business Account-1 at Bank-4 through a server in the Eastern District of New York. |

(Title 18, United States Code, Sections 1957(a), 1957(b), 1957(d)(1), 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

43.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds traceable to such offense, including but not limited to:

(a)     the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, and all proceeds traceable thereto;

(b)      the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, and all proceeds traceable thereto;

(c)      any and all funds on deposit in Bank-3 account number ending in 9142, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto; and

(d)      any and all funds on deposit in Bank-4 account number ending in 7135, held in the name of 7d Business Bureau Inc., and all proceeds traceable thereto.

44.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO</u>

45.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offense; and/or (b) Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense, including but not limited to:

(a)     the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, and all proceeds traceable thereto;

(b)     the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, and all proceeds traceable thereto;

(c)     any and all funds on deposit in Bank-3 account number ending in 9142, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto; and

(d)     any and all funds on deposit in Bank-4 account number ending in 7135, held in the name of 7d Business Bureau Inc., and all proceeds traceable thereto.

46.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

       (a)     cannot be located upon the exercise of due diligence;

       (b)     has been transferred or sold to, or deposited with, a third party;

       (c)     has been placed beyond the jurisdiction of the court;

       (d)     has been substantially diminished in value; or

       (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS THREE THROUGH SEVEN

47.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts Three through Seven, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to:

       (a)     the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at

432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, and all proceeds traceable thereto;

       (b)     the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, and all proceeds traceable thereto;

       (c)     any and all funds on deposit in Bank-3 account number ending in 9142, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto; and

       (d)     any and all funds on deposit in Bank-4 account number ending in 7135, held in the name of 7d Business Bureau Inc., and all proceeds traceable thereto.

       48.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

       (a)     cannot be located upon the exercise of due diligence;

       (b)     has been transferred or sold to, or deposited with, a third party;

       (c)     has been placed beyond the jurisdiction of the court;

       (d)     has been substantially diminished in value; or

       (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21,

United States Code, Section 853(p))

A TRUE BILL

_Deighton Reid_
FOREPERSON

_B P_
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK